**SARATOGA SAVINGS AND LOAN ASSOCIATION, Petitioner,**

v.

**FEDERAL HOME LOAN BANK BOARD, Respondent.**

No. 88–7209.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 1989.

Decided July 14, 1989.

Andrew L. Faber, Berliner, Cohen & Biagini, San Jose, Cal., for petitioner.

Steven W. Dimmick, Trial Atty., Federal Home Loan Bank Bd., Washington, D.C., for respondent. On the brief, Dorothy L. Nichols, Thomas J. Segal, Charlotte Kaplow, Edward J. O'Meara, for respondent.[*]

Before FARRIS, THOMPSON and TROTT, Circuit Judges.

FARRIS, Circuit Judge:

The Saratoga Savings and Loan Association petitions for review of a cease and desist order issued by the Federal Home Loan Bank Board. Saratoga challenges

---

[*] Rosemary Stewart, Director, Paul G. Leiman, Sr. Atty., Office of Enforcement, Federal Home Loan Bank Bd., Washington, D.C., for the FSLIC Staff before the Federal Home Loan Bank Bd.

the Board's authority to issue the order and the evidentiary basis for its findings of regulatory violations. We affirm in part, reverse in part, and remand.

## BACKGROUND

Saratoga is a California-chartered savings and loan association, opened in April 1983, whose accounts are insured by the Federal Savings and Loan Insurance Corporation. FSLIC was created by the National Housing Act of 1934, 12 U.S.C. §§ 1724–1730g, to protect depositors by insuring accounts at participating institutions and to prevent participating institutions from engaging in unsafe and unsound practices. 12 U.S.C. § 1726. The Federal Home Loan Bank Board is the operating head of the FSLIC. 12 U.S.C. § 1725(a).

As an FSLIC-insured institution, Saratoga is subject to periodic examination. During the fall of 1985, FSLIC examiners discovered what they believed to be several violations of Board regulations. In response, the Board issued a Notice of Charges and Hearing under 12 U.S.C. § 1730(e)(1). An administrative law judge conducted a hearing on the matter in February and March 1987, and issued a recommended decision in July 1987. The ALJ found that Saratoga had violated four Board regulations but recommended that the Board issue no order because the violations were isolated, technical, unintentional, or not likely to be repeated. The Board's Office of Enforcement filed exceptions to the Recommended Decision. Following oral argument, the Board issued a decision in May 1988 finding that Saratoga had violated Board regulations and engaged in unsafe and unsound practices. The Board issued a cease and desist order requiring Saratoga to comply with five specific Board regulations.

## STANDARD OF REVIEW

We review de novo questions of law, including the scope of an agency's jurisdiction. *See* 5 U.S.C. § 706(2)(C); *Social Security Board v. Nierotko*, 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946). We will uphold the Board's decision to issue a cease and desist order unless it is arbitrary, capricious, or an abuse of discretion. 5 U.S.C. § 706(2)(A); *Sears Sav. Bank v. Federal Sav. & Loan Ins. Corp.*, 775 F.2d 1028, 1029 (9th Cir.1985). The Board must have examined the relevant data and articulated a satisfactory explanation for its action. *Sears*, 775 F.2d at 1029. We also must determine whether substantial evidence supports the agency order. 5 U.S.C. § 706(2)(E); *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1076 (9th Cir.1977). Both the ALJ and the Board's findings are to be considered in determining whether the Board's factual conclusions are supported by substantial evidence. *See Penasquitos Village*, 565 F.2d at 1076. The Board may reverse the ALJ if it explains its reasons for doing so. *See Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1152 (9th Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 143 (1985).[1] We will defer to an agency's interpretation of those statutes that the agency is charged with administering, if its interpretation is reasonable. *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

## DISCUSSION

### A. *Overview*

Saratoga presents the following issues:

1. Did the Board have jurisdiction to consider matters not specifically raised by the Board staff in appealing the decision of the ALJ to the Board?

2. Must the Board show that a specific regulatory violation adversely affected the

---

1. Saratoga argues that the ALJ decision deserves great weight. This is not a case where the credibility of a witness was an important part of the case. *Compare Penasquitos Village*, 565 F.2d at 1082–1083 (credibility played dominant role in case where motive of employer was central

issue). The Board primarily disagreed with the ALJ's interpretation of its regulations. *See In the Matter of Saratoga Sav. & Loan Ass'n*, FHLBB No. 88–430, Decision and Order 60–63 (May 31, 1988).

financial stability of Saratoga, was knowingly made, or is likely to be repeated in order to issue a cease and desist order?

3. Must the Board dismiss its cease and desist order because it failed to comply with the statutory deadline for issuing a decision?

4. Were the Board's conclusions that Saratoga committed regulatory violations supported by substantial evidence? Specifically:

—Did Saratoga comply with the appraisal regulation in approving five loans?

—Did Saratoga comply with the accounting regulation in classifying certain transactions as loans and not direct investments?

—Did Saratoga violate the direct investment limitation regulation?

—Did Saratoga violate the loan fee deferral regulation?

—Did Saratoga violate the liability growth limitation regulation?

### B. *Jurisdiction*

■ The Board had jurisdiction to issue the cease and desist order under 12 U.S.C. § 1730(e). We have jurisdiction to review cease and desist orders under 12 U.S.C. § 1730(j)(2).

Saratoga argues that the Board is precluded from considering issues not raised in staff exceptions to the ALJ's decision concerning the appraisal requirements for five loans (the Price, Horn, Jaeger, Rule, and Lee/Thorpe/Raitz transactions). Under Board regulations, the failure of "a party" to file exceptions to any portion of the ALJ's decision is a waiver of that objection. 12 C.F.R. § 509.12(b). The Board first argues that the staff is not a party subject to the requirements of § 509.12(b). We disagree. Although the word party is not defined in that part of the regulations, the sections of the regulations concerned with procedure, of which the requirements for filing exceptions are a part, assume that the staff is a party. *See* 12 C.F.R. §§ 509.7 (subpoenas), 509.8 (depositions), 509.9(a) (evidence), 509.10(b) (objections to motions), 509.11(a) (proposed findings and

conclusions by parties), 509.11 (oral argument).

The Board also argues that its staff did take exceptions as required by 12 C.F.R. § 509.12(b). We agree in part. In its list of specific exceptions, the staff stated that:

> Because the Recommended Decision contains so many critical failings, the FSLIC staff has determined not to burden this Board with formal written exceptions to every erroneous finding, conclusion or recommendation. Of course, this determination should not be deemed to be agreement with, adoption of, or otherwise acquiescence in such findings, conclusions or recommendations as are not specifically excepted to.

Petitioner's Excerpt of Record 126–127 n. 2. The staff also discussed, in specific exceptions, the alleged regulatory violations that occurred in the appraisals for the Horn, Jaeger, Rule, and Lee/Thorpe/Raitz loans. *Id.* at 155–61, 170–84. Although the Price loan was not mentioned in the specific exceptions, it was discussed in the proposed final decision that accompanied the exceptions. *Id.* at 257. It also was addressed by the ALJ. *Id.* at 64–67. The cease and desist order does not mention any specific loans in regard to appraisal violations, but instead requires Saratoga to "observe FSLIC's appraisal regulation which requires safe and sound practices." In the Matter of Saratoga Sav. & Loan Ass'n, FHLBB No. 88–430, Decision and Order 63 (May 31, 1988). Saratoga has not alleged that it has suffered any prejudice from the failure of the staff to specify the Price loan in its exceptions. That loan was but one of several instances that the Board found violated appraisal regulations. Even if the Price loan is excepted from consideration, substantial evidence supports that portion of the order. The general exception stated in the footnote to the specific exceptions, the discussion of all but one of the violations, and the general nature of the cease and desist order, preclude our finding that the staff's exceptions failed to satisfy the requirements of § 519.12(b).

## C. *Statutory Authority*

■ Saratoga argues that the Board abused its discretion in issuing a cease and desist order without concluding that the regulatory violations in question would affect adversely the financial stability of Saratoga or the FSLIC insurance fund. Saratoga misinterprets the meaning of the statute and the interpretive case law. As Saratoga recognizes, the plain language of the statute contains no such requirement.

> If, in the opinion of the Corporation, any insured institution ... is violating or has violated ... a law, rule, or regulation ... the Corporation may issue and serve upon the institution ... a notice of charges in respect thereof.... [If] the Corporation shall find that any violation ... specified in the notice of charges has been established, the Corporation may issue and serve upon the institution ... an order to cease and desist from any such violation....

12 U.S.C. § 1730(e)(1). The statute is unambiguous in providing the Board with the power to issue cease and desist orders upon a finding of a regulatory violation. No other finding—of intent to violate, financial impact, or risk to the insurance fund—is required. In contrast, Congress did require a finding that a violation of law is likely to cause serious financial harm before the Board may issue a temporary cease and desist order. 12 U.S.C. § 1730(f)(1).

Given the unambiguous nature of the statute, recourse to legislative history is unnecessary. *See Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82; *see also Blanchard v. Bergeron*, — U.S. ——, 109 S.Ct. 939, 947, 103 L.Ed.2d 67 (1989) (Scalia, J., concurring) (criticizing use of congressional committee reports as authoritative exposition of legislative intent). Even if we reviewed the statute's legislative history, *see Harrison v. Northern Trust Co.*, 317 U.S. 476, 479, 63 S.Ct. 361, 362, 87 L.Ed. 407 (1942), we would have to conclude that the legislative history is consistent with the Board's view of its power to issue cease and desist orders. *See* S.Rep. No. 1482, 89th Cong., 2d Sess., *re-printed in* U.S.Code & Admin.News 3532, 3533, 3541–42, 3549, 3552–53 (1966).

Saratoga cites no authority that requires the Board to find that a specific violation will have an effect on the financial stability of the bank or the fund. Instead, the cases upon which it relies merely require that the underlying regulation have the financial stability of the bank as its purpose. *See First Nat'l Bank of Bellaire v. Comptroller of Currency*, 697 F.2d 674, 683 (5th Cir.1983) ("A Cease and Desist Order was clearly proper. The facts are undisputed and the Bank admits it was in violation of the statute when the loan was made. There is undoubtedly a direct relationship between compliance with 12 U.S.C. § 375a and a bank's soundness." (footnote omitted)); *see also Gulf Fed. Sav. & Loan Ass'n of Jefferson Parish v. Federal Home Loan Bank Bd.*, 651 F.2d 259, 263–66 (5th Cir.1981) (inquiry conducted into whether law was violated, not into whether violation threatened financial stability), *cert. denied*, 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982). Saratoga has not and could not successfully argue that the regulations it allegedly violated fail to achieve the purpose of ensuring financial stability of banking institutions and the insurance fund. To interpret the statute as Saratoga suggests would strip the Board of its authority to curtail abuses *before* they harm the institution.

■ Saratoga also argues that the Board abused its discretion in issuing the cease and desist order because the regulatory violations were technical, isolated, unintentional, and not likely to be repeated. When violations occur, the Board is within its discretion in issuing such an order and we review only to determine whether the order is arbitrary, capricious, or an abuse of discretion. The regulations at issue are a reasonable means of protecting insured depositors, the FSLIC fund, and ultimately federal taxpayers. *See Lincoln Sav. & Loan Ass'n v. Federal Home Loan Bank Bd.*, 856 F.2d 1558, 1562 (D.C.Cir.1988) (upholding direct investment limitation regulations). If Saratoga has violated the regulations, whether technically, sporadically, ac-

cidently, or otherwise, the Board is well within its statutory authority in ordering Saratoga to cease and desist from such violations. The Board's interpretation that the statute does not require intent or severe or repeated violations is a reasonable interpretation of the statute.

### D. *Failure to Comply with Statutory Deadline*

■ Section 1730(j)(1) requires the Board to render a decision within 90 days after notifying the parties that the case has been submitted for final decision. The Board issued a notice submitting the case on November 23, 1987. On March 10, 16 days after the 90–day deadline, the Board issued an order extending its deadline. The Board issued its final decision on May 31, 1988. Saratoga filed a motion to dismiss on the ground that the Board lacked jurisdiction because the Board failed to act within the time period set by the statute. We understand but reject the argument. The failure of an agency to comply with a statutory time limit does not divest the agency of jurisdiction. *Brock v. Pierce County*, 476 U.S. 253, 260–62, 106 S.Ct. 1834, 1839–40, 90 L.Ed.2d 248 (1986); *see also Sierra Pacific Industries v. Lyng*, 866 F.2d 1099, 1111–12 (9th Cir.1989) (discussing *Brock*). The proper remedy in such a situation is a suit under 5 U.S.C. § 706(1) to compel agency action. *Brock*, 476 U.S. at 260 n. 7, 106 S.Ct. at 1839 n. 7. Saratoga filed no such action. The Board's failure to meet the statutory deadline did not curtail its ability to issue the cease and desist order.

### E. *Substantive Violations*

Saratoga argues that there is a lack of substantial evidence to support the Board's conclusions that Saratoga violated certain regulations.

#### 1. *Appraisal Regulations*

■ The appraisal regulation requires that a lender, before approving a loan secured by real property, must obtain "[o]ne or more written appraisal reports, prepared and signed, prior to the approval of such application, by a person ... duly appointed and qualified ... by the board of directors of such institution, disclosing the market value of the security offered by the applicant and containing sufficient information and data concerning the appraised property to substantiate the market value of the security described in such report." 12 C.F.R. § 563.17–1(c)(1)(iii) (1985).[2] The Board found that Saratoga had violated the appraisal regulation by (1) failing to obtain appropriate appraisals prior to approving development loans; (2) failing to obtain appraisals with accurate or substantiated market values; and (3) failing to rely on appraisals prepared only by appraisers who were approved in advance by its board of directors. Each of these determinations is supported by substantial evidence.

Saratoga admits that it failed to have an appraisal for the real estate collateral in the Horn transaction, but argues that the violation was merely technical. The Board also found that Saratoga failed to obtain a written appraisal of the collateral for the Rule loan. Saratoga admits that it did not have essential written information supporting the appraisal until after the loans were approved, but again argues that the error was technical.

In making the Jaeger and Lee/Thorpe/Raitz loans, Saratoga did not approve the appraisers until the time of the loan decision. The issue is not one of proper delegation of authority, as Saratoga argues, but of timing. The Board reasonably interprets its regulation in requiring that approval of the appraiser occur before the loan is approved, instead of simultaneously. As the Board states, contemporaneous consideration of the choice of appraiser and loan approval does not encourage sound decision-making.

The other violations cited by the Board— that the appraisals for the Rule and Jaeger loans were inadequate—are departures from unpublished guidelines, known as the

**2.** The text of the current regulation is found at 12 C.F.R. § 563.17(c)(1)(iv) and contains slight-ly different language.

Memorandum R–41b standards, issued by the board. Memorandum R–41b sets out the substantive information an appraisal report should contain and details how "market value" is to be calculated. Saratoga argues that to justify issuance of a cease and desist order, a violation must be of "a law, rule, or regulation," 12 U.S.C. § 1730(e)(1), and because the Board has not published the appraisal guidelines as a rule or regulation, it may not penalize Saratoga for violating those guidelines.

The guidelines are a reasonable interpretation of the regulations, as the Board argues. Substantial evidence supports the Board's determination that Saratoga had actual notice of the requirements of those guidelines, because the guidelines were sent to every banking institution and were widely known within the banking and real estate industries. *See Haralson v. Federal Home Loan Bank Board,* 678 F.Supp. 925, 926–27 (D.D.C.1987). The Board's use of the guidelines satisfies this court's three-part test for when an unpublished rule interpretation is enforceable against a party. *See Nguyen v. United States,* 824 F.2d 697, 700–02 (9th Cir.1987) (explaining three factors to be weighed in analysis: whether the unpublished rule (1) is applied without warning, (2) deviates from the meaning of the underlying statute or regulation, and (3) is given conclusive effect by agency). The guidelines were not applied without warning and do not deviate from the meaning of the regulation. Even if they are given conclusive effect, that factor is not enough to outweigh the other two factors that strongly weigh in favor of the Board.

Substantial evidence supports the Board's finding that Saratoga violated the appraisal regulations and should be required to observe them in the future.

## 2. *Accounting Regulation*

■ The accounting regulation describes the accounting treatment that FSLIC institutions must use for "acquisition, development, and construction ('ADC') loans." 12 C.F.R. § 571.17(a) (1986). The regulation is entitled "Accounting for acquisition, de-velopment and construction loans." The Board found that Saratoga violated the regulation by misclassifying five transactions. Three transactions (the Horn, Jaeger, and Rule loans) were for acquisition and development only and did not involve construction. Saratoga argues that the accounting regulation should not apply to these three loans because they are acquisition and development, not acquisition, development, and construction, loans. The Board argues that its interpretation of the regulation to apply to acquisition and development loans must be upheld unless that interpretation is demonstrably irrational. The Board further argues that its interpretation is reasonable because both types of loans have the same characteristics as an investment.

We find the Board's interpretation to be unreasonable. It has not promulgated a general accounting regulation; the regulation is confined solely to the accounting treatment for acquisition, development, and construction loans. The regulation contains no statement that it applies to other types of loans. The Board provides no other justification for its finding that the acquisition and development loans violated the ADC regulation. It did provide a substantial factual basis for its conclusion that the Horn, Jaeger, and Rule transactions have the characteristics of direct investments rather than loans but it only cites the ADC regulation as being violated by that conclusion. The ADC regulation cannot apply to the three acquisition and development loans in the absence of general inclusive language.

Saratoga admits that it violated the accounting regulation in the Price and Lee/Thorpe/Raitz transactions. It argues those violations should be excused because they were unintentional, made in good faith, promptly remedied, and caused no financial harm. We understand but reject the argument. The Board is within its discretion in ordering Saratoga to cease and desist from the violations.

The Price and Lee/Thorpe/Raitz violations are sufficient to support the cease and desist order's requirement that Sarato-

ga follow the accounting regulation. However, the Board should not apply the ADC regulation to acquisition and development transactions unless and until it properly modifies the language of that regulation to encompass acquisition and development transactions.

### 3. *Direct Investment Limitation*

 The direct investment limitation regulation provides that "no institution shall make a direct investment if immediately thereafter its aggregate direct investment would exceed the applicable threshold." 12 C.F.R. § 563.9–8(c)(2)(i) (1986). As a result of the Board's directive that Saratoga reclassify five transactions from loans to direct investments, its aggregate direct investments exceeded the threshold. Saratoga argues that it did not violate the regulation because it was in compliance until the Board required it to reclassify five transactions from loans to direct investments. It reasons that it did not knowingly "make a direct investment" in excess of the limit because it was in compliance until the Board ordered the transactions reclassified.

Saratoga's interpretation of the regulation effectively nullifies it. Under Saratoga's reasoning, an institution could ensure compliance simply by misclassifying transactions as loans instead of direct investments. When the transactions are reclassified after an examination, the institution can claim to never have "made a direct investment" in excess of the limit. The Board has the burden of proving that Saratoga violated the regulation. *See* 5 U.S.C. § 556(d). The Board has satisfied that burden by showing that Saratoga holds direct investments in excess of the limit. It need not show that Saratoga knowingly engaged in a specific transaction that exceeded the limitation.

The Board should not have ordered the Horn, Jaeger, and Rule acquisition and development transactions reclassified as direct investments solely on the basis of 12 C.F.R. § 571.17. The Board should modify its order unless (1) it has some other basis for requiring Saratoga to reclassify those transactions, or (2) it finds that Saratoga violated the direct investment limitation regulation if only the Price and Lee/Thorpe/Raitz transactions are reclassified.

### 4. *Loan Fee Deferrals*

The loan fee deferral regulation requires that institutions defer loan fees and credit them to income at least semiannually. 12 C.F.R. § 563.23–1(d), (g). Saratoga admits that it had a policy of not following the regulation for loans with terms of less than one year. Saratoga then states that it did not admit violating the regulation with regard to any particular loan. Saratoga's admission that its policy violated the regulation is substantial evidence that supports the Board's requirement that Saratoga comply with the regulation.

### 5. *Liability Growth Limitation Regulation*

 The liability growth limitation regulation limits the rate at which an institution may increase its total liabilities. 12 C.F.R. § 563.13–1. Saratoga admits violating the regulation in two quarter periods— April–June 1985 and January–March 1986. Saratoga argues that it interpreted the regulation to imply that it could violate the regulation in any one quarter, as long as it did not violate the regulation in the preceding and succeeding quarters. *Id.* That interpretation finds no basis in the language of the regulation. Substantial evidence supports the Board's finding that Saratoga violated the regulation. Since the time of Saratoga's violations, the Board modified the regulation so that it imposes no liability growth limitations on institutions whose net worth is greater than six percent of total liabilities. Saratoga argues that because its current net worth is greater than six percent, its violation is now moot. Even if Saratoga is in current compliance with the liability growth limitation regulation, the Board's conclusion that Saratoga did violate the regulation in the past is supported by substantial evidence. The Board is within its discretion in issuing a cease and desist order to ensure that Saratoga does not attempt to follow its

incorrect interpretation of the regulation if its current net worth falls below six percent of liabilities or if the Board removes the six percent provision from the regulation.

### 6. *Other Issues*

Saratoga disagrees with the Board's conclusions that it violated the fidelity bond coverage and affiliated transaction regulations. The violations were not included in the cease and desist order. We lack jurisdiction to review those conclusions if they are not within the scope of the order. *See* 12 U.S.C. § 1730(j)(2) (court of appeals has authority to review "any *order*" of Board) (emphasis added).

### CONCLUSION

We uphold the Board's cease and desist order with two exceptions. First, the Board's finding that Saratoga violated the ADC regulation in making the three acquisition and development loans is reversed. Second, the Board should reconsider its conclusion that Saratoga violated the direct investment rule in light of our ruling concerning the ADC regulation.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED. Each party shall bear its own costs.